IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MARJORIE RIEDY, | ) | CASE NO. 1:06 CV 2456 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | WILLIAM H. BAUGHMAN, JR. |
| v. | ) | |
| | ) | |
| AVERY DENNISON | ) | **MEMORANDUM OPINION** |
| CORPORATION, *et al.*, | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

## Introduction

Before me[1] are cross-motions for judgment on the administrative record filed by plaintiff Marjorie Riedy[2] and defendant Avery Dennison Long-Term Disability Insurance Plan[3] in this matter arising out of Riedy's claim that the Plan improperly terminated her long-term disability benefits.[4]  After extensive briefing on the motions[5] and an oral argument,[6] the case is ready for resolution.

---

[1] ECF # 14.  The parties have consented to my exercise of jurisdiction.

[2] ECF # 18.

[3] ECF # 19.

[4] ECF # 5 (first amended complaint).

[5] ECF ## 20, 21, 22, 27, 28.

[6] ECF # 29.

## Facts

### A.      Background and original claim

The relevant facts here are straightforward and not disputed.  Riedy,[7] a 56-year old female, was employed as a machine operator at Avery Dennison in Cleveland from 1998 to 2003, when she became unable to continue her work because of pain.[8]  As a result, she applied for and received benefits under the Plan, which provided an initial 24 months of disability benefits to employees who became unable to perform the essential functions of their regular occupation due to a physical or mental condition.[9]

It should be noted that the Plan pays benefits in accordance with the terms of a group insurance policy issued to Avery Dennison by Lumbermens Mutual Casualty Company,[10] and is administered by Broadspire National Services.[11]

Following medical treatment that concluded in early 2004, Riedy was briefly able to cease receiving disability payments and to return to her regular job at Avery Dennison for

---

[7] At the time of these events, Riedy is identified in the documents by her maiden name of Kovach.  For the sake of consistency and clarity, she is referred to throughout this opinion by her current married name of Riedy.

[8] ECF # 18 at 2; ECF # 20 at 3.  Riedy here describes her initial disability as due to pain in her right ankle; the Plan now describes it as pain related to back problems and knee surgery.  The record shows that Riedy made all these complaints to Plan investigators in 2004.  *See*, ECF # 19 at 218.

[9] *Id.*

[10] ECF # 19 at 1.

[11] *See*, *id*. at 15.

a few months in mid-2004 before being again disabled by pain, after which she again began receiving disability payments under the Plan.[12]

## B.      Claim evaluation by the Plan and denial of the claim

In light of this resumption of benefits, the Plan caused a functional capacities evaluation (FCE) to be performed on Riedy in September, 2004 to determine her status under the Plan.[13]   The FCE concluded that Riedy was not able to perform "the key physical demands" of her prior job, but that Riedy was functioning in the "light physical demand category."[14]  In light of these findings, Riedy's  monthly long-term disability benefits were restored for the remainder of the 24-month period applicable to employees unable to perform the essential functions of their regular occupation.[15]

This 24-month period of benefits for inability to perform in the beneficiary's regular job was due to expire in Riedy's case in November, 2006.[16]  To remain eligible for continuing long-term disability benefits beyond that date, however, the Plan required Riedy to prove that she was unable to perform the essential functions of "any gainful occupation that [her] training, education, and experience would allow [her] to perform."[17]  Riedy was

---

[12] *Id*. at 248-49.

[13] *See*, *id.* at 213-38.

[14] *Id.* at 215.

[15] *Id.* at 248-49.

[16] ECF # 20 at 4.

[17] ECF # 19 at 248.

notified of this impending change in her status with the Plan by letter dated March 17, 2005.[18]

Subsequent to this letter and prior to making a final decision as to Riedy's eligibility for benefits, the Plan sent Riedy to a board-certified orthopaedic surgeon for an independent medical examination (IME).[19]  Based on his personal examination of Riedy and a review of the records in this matter, including the FCE, that physician agreed that Riedy was suffering from osteoarthritis in her right ankle and both knees, as well as a herniated disc, but concluded that she was not "totally disabled from any and all occupations," offering his opinion that she could "work in a sedentary or light work capacity job."[20]

Given the conclusion of both the FCE and the IME regarding Riedy's suitability for sedentary or light work, the Plan then ordered an employability assessment report (EAR) to determine what kind of employment would be available to Riedy within 60 miles of Cleveland consistent with her education, experience, skills, past wage level and physical restrictions noted by the examining physician in the IME.[21]  In the EAR dated September 14, 2005, three available occupations in the Cleveland job market were listed as being "closest and good" matches for Riedy.[22]  In addition, the EAR also listed another occupation, that of

---

[18] *Id*. at 291.

[19] *Id*. at 359-61.

[20] *Id.* at 361.

[21] *Id*. at 365.

[22] *Id*. at 369.

phone solicitor, as matching Riedy's stated desire to use her interpersonal skills on the phone while working on the computer, although the EAR did note that Riedy had no existing work experience with this kind of employment but likely could establish the requisite skills and work history to obtain such a job.[23]  The EAR concluded by finding Riedy "employable" within those given limitations.[24]

Accordingly, after specifically citing to its review of the FCE, IME, and EAR, the Plan, on September 26, 2005, notified Riedy that she did not meet the Plan definition of long-term disability in that she was not disabled from performing the material duties of any gainful occupation and that her long-term disability benefits would end on November 26, 2005.[25]

## C.  Administrative appeal of the denial; denial upheld

This termination letter also notified Riedy that she was eligible for a review of the determination of ineligibility.  Riedy was told in this letter that to change the Plan's finding, she must (1) make a written appeal, and (2) provide the Plan with current medical documentation demonstrating that she is disabled under the Plan's definition, including medical data and proof of any functional restrictions or limitations.[26]  Specifically, the Plan informed Riedy that the kind of relevant documentation that would be necessary to support

---

[23] *Id.*

[24] *Id.* at 370.

[25] *Id.* at 378.

[26] *Id.* at 379.

a reversal of its previous finding would "include but not be limited to:  Physical Therapy Notes, X-Rays, MRI results or Pain Management Evaluations and treatment notes."[27] She was also informed as to the deadlines for making an appeal.[28]

Riedy did timely appeal the decision denying her long-term disability benefits.  In her letter requesting re-evaluation of her claim and reinstatement of benefits, she stated:

(1)    that she "was totally disabled and unable to work" regardless of what the IME had concluded;

(2)    that the IME was "nothing but a routine examination" and was in contrast to "medical reports" from her own doctor, which had been provided to the Plan;

(3)    that the Plan should review her submitted information and "contact me if you need any additional information;"

(4)    that she was "unable" to work in sedentary or light occupations and "disagree[d]" with the "assumption" that she could perform any job listed in the EAR;

(5)    that she "disagree[d]" with the determination that she did not meet the definition of disability; and

(6)    that she had "been classified as permanently disabled by the Social Security Administration," was "receiving Medicare benefits," and was also being treated for hypertension and diabetes.[29]

With this appeal, Riedy also submitted a letter from her personal physician, noting that he had been her physician for two and a half years, listing her medical conditions and opining

---

[27] *Id.*

[28] *Id.*

[29] *Id.* at 415.

that it was "[his] feeling within the reasonable medical certainty [sic]" that Riedy was "totally and permanently disabled from sustained remunerative employment."[30]   Riedy also apparently notified the Plan of the fact that she had been classified as permanently disabled by the Social Security Administration[31] but did not furnish the Plan with  the decision of the administrative law judge detailing the basis for the finding of disability.[32]

The Plan thereupon submitted Riedy's appeal, together with the accompanying file, to Dr. Ira Posner, an orthopaedic surgeon and specialist in pain management, for an independent peer review.[33]  In his report,[34] the physician peer reviewer considered the entire file that had been available to the Plan when it made its original determination that Riedy was not disabled,[35] plus the additional material submitted by Riedy in her appeal.[36] He concluded first that, because the IME had found Riedy was capable of only sedentary or light work, the finding of the EAR that Riedy was a match for the positions of instrument assembler, service attendant, and assembler of surgical garments was likely incorrect since those occupations

------------------------------------------

[30] *Id*. at 416.

[31] *Id.* at 415.

[32] *See*, *id*. at 420 (listing of documents reviewed by the Plan on appeal).

[33] *Id*. at 419-20.

[34] *Id*. at 424-27.

[35] *Id*. at 424-25

[36] *Id.* at 425.

"do not allow for a change of position frequently as they are assembly line jobs."[37] However, the peer reviewer then observed that the telephone solicitor position also identified in the EAR would be appropriate for Riedy in that it would permit her to change positions frequently as needed.[38]

Finally, the peer reviewer discounted the opinion rendered by Riedy's personal physician that she was totally disabled because he had not conducted any detailed personal examination of Riedy nor supplied "any evidence of any functional or neurological impairment that would support his opinion."[39]

Thus, the peer reviewer concluded that "there was no evidence of functional impairment or neurological deficit that would preclude [Riedy] from participating in sustained work activity at a sedentary-to-light duty level."[40]

Based on this peer review, the Plan, through its appeal committee, upheld the original decision to deny Riedy long-term disability benefits under the Plan and informed her of her right to bring a civil action under ERISA challenging that action.[41]

---

[37] *Id.* at 426.

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] *Id.* at 420.

**D.      The present suit**

Riedy did file suit in this Court[42] against the Plan under the Employee Retirement Income Security Act (ERISA).[43]  In her complaint, Riedy alleges that:

(1)      she was denied long-term disability benefits by the Plan;

(2)      she was fully vested and entitled to receive those benefits;

(3)      the Plan erroneously interpreted Plan provisions for awarding benefits, failed to consider evidence of Riedy's total and permanent disability, and failed to afford Riedy a full and fair review of her claim; and, therefore,

(4)      the Plan's decision denying Riedy benefits "was arbitrary, capricious, not made in good faith, unsupported by substantial evidence, erroneous as a matter of law, and in violation of ERISA."[44]

The Plan answered by denying Riedy's allegations.[45]  Both parties then moved for judgment on the administrative record.[46]

---

[42] ECF ## 1(complaint), 5(first amended complaint).

[43] 29 U.S.C. § § 1001 *et seq*.

[44] ECF # 5 at 2-3.

[45] ECF # 8.

[46] ECF ## 18 (Riedy); 19 (the Plan).

**E.    The motions for judgment on the administrative record**

*1.    Riedy's motion*

In her motion, Riedy essentially argues that the Plan placed too much weight on the IME while ignoring the findings of Dr. Levy, Riedy's personal physician.[47]  Riedy further takes issue with the Plan appeal committee not requesting supporting data from Dr. Levy if they believed his conclusion of total disability was unsupported in the record and further disputes the Plan's contention that "objective medical criteria [sic] is necessary to meet the plan's definition of disabled."[48]

In addition, Riedy notes that while the Plan relied on the independent peer review's conclusion, as well as that of the EAR,  that employment as a phone solicitor was suitable for Riedy in that it was sedentary or light duty work, the record contains no finding that Riedy was qualified to work as a phone solicitor.[49]  Finally, Riedy contends that her receipt of Social Security benefits is in conflict with the Plan's finding of no disability, and that contrary finding should have been addressed and justified by the peer review and the appeal committee.[50]

The Plan, in response to Riedy's motion, asserts:

---

[47] ECF # 18 at 5.

[48] *Id*. at 6.

[49] *Id*. at 7-8.

[50] *Id.* at 8-9.

(1)     the Plan need not accord any special deference to the opinion of Riedy's personal physician, but may, as here, appropriately discount the conclusion of even a treating physician when his finding of disability was merely conclusory and not supported by any objective evidence or data that, despite her acknowledged infirmities, Riedy was unable to perform in "any" occupation;[51]

(2)     Riedy is incorrect in asserting that the Plan had any burden to request any  additional documentation from Dr. Levy, since it was Riedy who had the burden of proving her disability and not the Plan's duty to identify, for Riedy, those documents that would prove her case;[52]

(3)     the Plan has the discretion to require reasonable proof of disability, and it is not unreasonable to demand objective medical evidence to support a claim, particularly since Riedy was on notice of this requirement in advance of her submission of the appeal with just Dr. Levy's conclusory letter;[53]

(4)     since the Plan's terms to do not require it to conduct an EAR or labor market survey, if Riedy does not believe that a phone solicitor's job, as identified in the EAR, should be considered as available to her, as stated by the EAR and the peer review, it is her burden to establish that with supporting evidence;[54] and,

(5)     though the Plan's treatment of the SSA's decision to award benefits to Riedy can be a factor in determining whether the Plan's decision not to award benefits was arbitrary and capricious, an award by the SSA is not dispositive and its finding of disability does not preclude the Plan from reaching a different result, particularly since the Plan may legally grant benefits only in strict accordance with its written provisions, which provide a different standard for awarding benefits than does the SSA.[55]

---

[51] ECF # 21 at 4-5.

[52] *Id*. at 6-7.

[53] *Id.* at 7-8

[54] *Id*. at 8-9.

[55] *Id.* at 9-12.

As noted, each party has submitted responses to the arguments advanced by the other and has fully articulated their arguments and replies in oral argument.  Accordingly, the matter is now ready for resolution.

## Analysis

### A.    Standard of review

#### 1.    *ERISA/arbitrary and capricious*

A beneficiary's challenge to the denial of long-term benefits under a plan governed by ERISA requires me to review the plan administrator's decision in light of the evidence in the administrative record that was before the plan administrator at the time.[56]  Where the plan at issue gives the plan administrator discretionary authority to construe and interpret the plan's terms, as here,[57] the plan administrator's decision is reviewed to determine if it was "arbitrary and capricious."[58]  Both parties in this matter explicitly accept that the arbitrary and capricious standard applies here.[59]

---

[56] *Wilkins v. Baptist Healthcare Sys.*, 150 F.3d 609, 615 (6th Cir. 1998) (citations omitted).

[57] The Plan here provides that the administrator has "full discretion and authority" to "interpret all policy terms and conditions" and "establish and enforce rules and procedures for the administration" of the Plan.  ECF # 19 at 17.

[58] *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 168 (6th Cir. 2003).

[59] ECF # 27 (Riedy) at 4; ECF # 20 (Plan) at 7.

-12-

As the Sixth Circuit has recently stated:

> "'The arbitrary and capricious standard is the least demanding form of judicial review of administrative action.  When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious.'  Under this deferential standard of review, an appellate court will uphold the plan administrator's decision if it is 'rational in light of the plan's provisions.'  Stated differently, if the decision 'is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence,' the decision will be upheld."[60]

However, the Sixth Circuit has also been careful to emphasize that "merely because our review [under the arbitrary and capricious standard] must be deferential does not mean our review must also be inconsequential.  While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions."[61]  Rather, in determining whether the plan administrator's decision to deny benefits was arbitrary or capricious, reviewing courts are to consider the quantity and quality of the medical evidence in the administrative record and the opinions on both sides of the issues.[62]

Moreover, as the United States Supreme Court recently held, even in cases involving the arbitrary and capricious standard of review, the concepts of trust law and fiduciary duty must undergird the plan administrator's decision.[63]  Thus, the reviewing court must be

---

[60] *Rose v. Hartford Fin. Servs. Group*, No. 07-5423, 2008 WL 648965, at *4 (6th Cir. March 11, 2008) (internal citations omitted).

[61] *McDonald*, 347 F.3d at 172 (citation omitted).

[62] *Id.*

[63] *Metropolitan Life Ins. Co. v. Glenn*, __ U.S. __, 128 S.Ct. 2343, 2347-48 (2008).

mindful that when an insurance company is both the decision-maker as to awarding benefits and the payee of any benefit, there is an inherent conflict of interest that, while not precluding deferential review, must be weighed as a factor in determining if there has been abuse of discretion.[64]

In addition, the Sixth Circuit has consistently held that a claimant "carries the burden of presenting evidence showing that she was disabled from performing any occupation for which she was reasonably qualified by education, training and experience."[65]  This burden on the claimant recognizes that a distinction exists between requiring a claimant to establish a level of pain, proof of which is inherently subjective and cannot be required of a claimant, and requiring a claimant to establish the limits in her functional capacities, proof of which can be objectively measured and so can be required of the claimant.[66]

Finally, although the failure of a plan administrator to discuss a disability determination by the Social Security Administration (SSA) must be considered as a factor in determining the arbitrariness of the plan's decision to deny benefits,[67] such a determination

---

[64] *Id.* at 2346.

[65] *Rose*, 2008 WL 648965, at *7 (citation omitted).

[66] *Id.* at *9; *Huffaker v. Metropolitan Life Ins. Co*., No. 07-5410, 2008 WL 822262, at *6 (6th Cir. March 25, 2008); *see also*, *Patrick v. Hartford Life & Accident Ins. Co.*, 543 F. Supp. 2d 770, 778 (W.D. Mich. 2008) ("[A] plan administrator does not act arbitrarily and capriciously in denying a claim for benefits when the claimant fails to provide objective evidence supporting her functional limitations.").

[67] *Bennett v. Kemper Nat'l Servs.*, 514 F.3d 547, 553-54 (6th Cir. 2008).

-14-

[by SSA] is not dispositive of the [long-term disability] benefits decision.[68]  In the end, as the Sixth Circuit has recently held, if the plan (1) encouraged the applicant to seek SSA benefits, (2) financially benefitted from the claimant receiving an SSA award, and (3) then failed to discuss why its decision denying long-term disability benefits was at variance with the SSA award, "the reviewing court should weigh this in favor of a finding that the [plan's] decision was arbitrary and capricious."[69]

Similar to the requirement to consider a conflict of interest and a failure to discuss a contrary finding by the SSA, the reviewing court must also factor in whether the plan administrator based a decision to deny benefits on a mere file review as opposed to conducting a physical examination of the applicant.[70]

## 2.    *The Plan's decision to deny benefits to Riedy was not arbitrary and capricious*

Riedy, as noted, essentially raises five arguments as to why the Plan's decision was arbitrary and capricious:

(1)    the Plan improperly gave controlling weight to its own IME rather than the findings of Dr. Levy, Riedy's personal physician;

---

[68] *Whitaker v. Hartford Life & Accident Ins. Co.*, 404 F.3d 947, 949 (6th Cir. 2005) ("[A]n ERISA plan administrator is not bound by [an SSA] disability determination when reviewing a claim for benefits under an ERISA plan.").

[69] *Bennett,* 514 F.3d at 554; *but see*, *Hall v. National City Corp. Welfare Benefits Plan,* No. 1:07-cv-649, 2008 WL 1901388 at *11 (N.D. Ohio April 25, 2008) (SSA award contrary to plan decision not controlling where record considered by plan administrator contained no explanation of SSA's decision and no evidence supporting it).

[70] *Bennett*, 514 F.3d at 553.

-15-

(2)     the Plan should have requested further data from Dr. Levy if it believed his conclusions were not properly supported in the record;

(3)     the Plan was incorrect in requiring objective medical evidence for proof of disability;

(4)     the Plan improperly relied on the judgment of the independent peer review that employment as a phone solicitor was suitable for Riedy when there were no findings that Riedy was actually qualified for that employment; and

(5)     the Plan did not address the contrary findings by the SSA and so justify coming to a contrary conclusion.

Before considering these arguments, I note initially, pursuant to the recent teachings of *Bennett* concerning factors that must be considered, (1) that there is no inherent conflict of interest present here; (2) that the Plan did not rely merely on a file review; and (3) that the Plan's treatment of Riedy's SSA award, which was unaccompanied by any supporting medical or functional capacities evidence, was, even if weighed as a factor in favor of finding the Plan's decision arbitrary and capricious, not so strong a factor as to compel a finding that the Plan's decision was arbitrary and capricious.

First, as directly noted in the *Bennett* decision itself, Broadspire, the company administering the Plan here, is independent from Lumbermens, the company that would pay benefits under the Plan.[71]  Thus, according to the Supreme Court's recent definition in *Glenn*,

---

[71] *Id.* at 552.

-16-

there is no conflict of interest here because the party that evaluates the claim for benefits under the Plan is not the party that pays benefit claims.[72]

Next, the record in this matter is plain that the Plan did not rely on merely a file review of Riedy's medical record but based its finding on an extensive amount of factual evidence developed by the Plan itself through the use of independent experts.  Specifically, the Plan: (1) had an independent physical examination of Riedy conducted; (2) had Riedy evaluated for her functional capacity; (3) commissioned an employability assessment report as to what employment options were available to Riedy specifically in light of her demonstrated functional limitations; (4) had a labor market survey conducted to evaluate whether the work opportunities identified for Riedy in the employability assessment report were actually present in this area and would afford Riedy an appropriate income; and, (5) submitted all these findings and supporting evidence to an independent peer reviewer for evaluation on appeal.

Whatever the arguments here as to the conclusions drawn by the Plan on this record, it seems undeniable that the Plan, by utilizing an extensive number of independent professionals to review the medical, functional, and economic elements of Riedy's claim in a series of thorough and detailed reports based on actual examinations of Riedy, acted in conformity with the Supreme Court's emphasis in *Glenn* on fiduciary duties in  handling

---

[72] *See*, *Glenn*, 128 S.Ct. at 2348.

-17-

these sorts of claim and created a record suitable for engaging in a "deliberate, principled reasoning process" in arriving at its final decision.[73]

Finally, as to the Plan's treatment of Riedy's SSA award, I am reluctant to read *Bennett* as essentially mandating the assignment of a compulsory penalty point to the Plan here because it did not explicitly discuss the SSA award in arriving at a contrary conclusion. The record before the Plan contained only the award letter itself with no explanatory opinion by the administrative law judge as to why Riedy was granted benefits and no record of what medical evidence, if any, was considered by SSA.[74]  In this posture, the Plan did not so much evade a reasoned principled discussion of how its contrary decision regarding benefits can be distinguished from SSA's decision but rather reasonably focused on the only actual evidence before it concerning Riedy's documented functional capacities and their application to her continued employment.

---

[73] *See*, *Bennett*, 514 F.3d at 554, quoting *Glenn v. Metlife*, 461 F.3d 660, 666 (6th Cir. 2006).

[74] As discussed in oral argument here, it is plausible that, given Riedy's age and closeness to retirement, she may have "gridded out" at SSA and been awarded benefits without any detailed review of whether, with her admitted impairments, she was still capable of further employment.  Further, also at oral argument, Riedy admitted that she had not furnished the Plan with the file she sent to SSA to support her claim there.  Thus, in order to meaningfully distinguish its conclusion of no disability under the Plan's definition from SSA's award of benefits and to discuss that distinction in "a deliberate, principled reasoning process," the Plan would have first needed to discern from nothing why SSA did what it did. Again, I am reluctant to conclude from *Bennett* that it requires the Plan either to painstakingly construct a basis for SSA's award where none was given or incur an automatic demerit if its decision is challenged in court.

If, however, *Bennett* is to stand for a rule that in every case where SSA has awarded benefits but the plan has not, the plan must fully discuss why it arrived at a contrary position or a reviewing court must weigh that failure as a factor in favor of concluding its decision was arbitrary and capricious, then I conclude, on these facts, that the Plan's lack of discussion of Riedy's SSA award in this case does not outweigh the other factors and the deference due the Plan's decision.

Specifically, as noted, the Plan undertook a thorough, independent review of Riedy's claim from medical, functional, and economic perspectives.  It subjected its conclusions to an independent peer reviewer.  Beyond simply concluding that Riedy had not met her burden of proving she was disabled under the meaning of the plan, the Plan affirmatively produced objective evidence, never contradicted by Riedy, that she was not.

Having discussed the SSA award in the context of *Bennett*, as well as the other *Bennett* factors, I turn now to Riedy's remaining contentions.

First, her arguments – (1) that the Plan did not give proper weight to her physician's letter as against the independent medical examination, (2) that the Plan was improper in requiring objective evidence of her medical impairment, and (3) that the Plan should have requested additional information from Dr. Levy if they felt his letter was incomplete – rest, at the core, on a fundamental misapprehension of the burden of proof in this case.  As discussed earlier, it is Riedy's burden to show that she is not disabled within the meaning of the plan.

-19-

As such, as was discussed earlier, it is Riedy's burden to provide the Plan with objective evidence of the disabling consequence of her functional limitations or risk losing her claim. Because the plan administrator has the authority under the plan to interpret all policy terms and conditions, he may reasonably require Riedy to provide objective evidence of the disabling effect of her functional limitations even though the plan itself does not so specify.[75]  Further, if a claimant, such as Riedy, chooses instead to provide a merely conclusory letter alleging disability but does not support that conclusion with objective evidence of how specific measurable functional limitations[76] prevent the claimant from performing any occupation for which she was reasonably qualified, the Plan is justified in not ascribing significant probative value to that submission[77] and concluding that the claimant has not met her burden.

Moreover, the Plan, as noted, did more than point out that Riedy's letter from Dr. Levy was not objective evidence of a disability as defined in the plan;[78] it also provided objective evidence from multiple sources showing that she was not disabled under the plan's definition and explained its decision to credit its independent sources rather than Dr. Levy. In addition, Riedy's contention that the Plan should have affirmatively sought out additional

---

[75] *Rose*, 2008 WL 648965, at * 8.

[76] As distinct from medical conditions or levels of pain that may or may not cause functional limitations.

[77] At a fundamental level, the Plan is not required to assign any special weight to the opinion of a treating physician.  *See*, *Rose*, 2008 WL 648965, at **5-6.

[78] Though the peer review does explicitly make that observation.  ECF # 21 at 426.

information from Dr. Levy would impose a duty on the Plan inconsistent with Reidy's burden of proof. As such, the Plan's actions here were reasonable and not arbitrary or capricious.

Riedy also contends that the Plan was arbitrary and capricious in relying on the peer review's determination that her functional limitations permitted her to be employed as a phone solicitor despite the fact that no finding was made in the EAR that she was qualified for that position. Again, this argument starts from the erroneous premise that it is the Plan's duty to prove Riedy is not disabled, rather than Riedy's burden to show that she is.

In fact, the functional capacities evaluation is replete with detailed objective evidence of Riedy's measurable physical skills – the only such evidence in the record. From this objective evidence, the FCE concluded that these skills were consistent with employment in the light physical demand category. So, too, did the peer reviewer utilize these objective measurements of physical skill levels, as well as Riedy's stated desire to work with computers, to conclude that she could be employable as a phone solicitor. If Riedy believed that conclusion was unsupported by the evidence, she had a duty to produce that evidence proving her conclusion. No contrary objective evidence was ever submitted by Riedy.[79] Thus, substantial evidence supports the Plan's reliance on (1) the only objective evidence of

---

[79] I note that Riedy did not argue then, nor does she now, that employment as a phone solicitor would not produce "a reasonably substantial income rising to the dignity of an income or livelihood, even though the income is not as much as [s]he earned before the disability." *Helms v. Monsanto Co.*, 728 F.2d 1416, 1421 (11th Cir. 1984), quoted in *Tracy v. Pharmacia & Upjohn Absence Payment Plan*, 195 F. App'x 511, 519 (6th Cir. 2006).

Riedy's actual, measurable physical function and (2) Riedy's own occupational preferences as interpreted by (3) the only reasoned analysis of those factors in light of a specific job when (4) Riedy had not, despite being asked to do so, provided any objective evidence to the contrary.  As such, the decision that Riedy was employable as a phone solicitor cannot be said to be arbitrary and capricious.

## Conclusion

Accordingly, I conclude that the Plan's decision to deny Riedy long-term benefits was the result of a deliberate, principled reasoning process, supported by substantial evidence and not impaired by the presence of any of the *Bennett* factors.  As such, I find that the Plan's decision was not arbitrary and capricious, thus mandating the Plan be awarded judgment on review of this record.

IT IS SO ORDERED.

Dated:  August 5, 2008                                s/ William H. Baughman, Jr.
                                                      United States Magistrate Judge

-22-